UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:19cv63044

LACEY WIMBLE, KATELYN PEREZ
and JENNIFER CASTANEDA,

      Plaintiffs,

v.

DMD FLORIDA RESTAURANT GROUP A, LLC,
DMD FLORIDA DEVELOPMENT LLC,
DMD RESTAURANT GROUP LLC, and
DOUBLE MOUNTAIN DEVELOPMENT
VENTURES LLC, f/k/a JAFREJO HOLDINGS LLC,

      Defendants.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Lacey Wimble ("Wimble"), Katelyn Perez ("Perez") and Jennifer Castaneda ("Castaneda"), by and through their undersigned attorney, hereby file this Complaint against Defendants, DMD Florida Restaurant Group A, LLC ("DMD"), DMD Florida Development LLC ("DMD Florida"), DMD Restaurant Group LLC ("DMD Restaurant Group"), and Double Mountain Development Ventures LLC, f/k/a Jafrejo Holdings LLC ("DMD Ventures") (collectively, and for purposes of references under the joint enterprise and joint employer theories, the entities shall be referred to as the "DMD Corporate Family"), for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), as amended, which includes the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k) ("PDA"); Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), as amended; the Florida Civil Rights Act of 1992, Fla. Stat. § 760.10, *et seq.* ("FCRA"), as amended; the Fair

Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), as amended; and federal and state common law.

## INTRODUCTION

1.  Wimble, Perez and Castaneda were employed by the DMD Corporate Family, which operates (with other DMD-related business entities) several Twin Peaks Sports Bar & Restaurant ("Twin Peaks") franchises in South Florida and Southwest Florida. The current[1] franchises are located at: 2000 South University Drive, Davie, Florida 33324 ("Twin Peaks Davie")[2]; 16411 Corporate Commerce Way, Fort Myers, Florida 33913 ("Twin Peaks Fort Myers"); 440 SW 145th Avenue, Pembroke Pines, Florida 33027 ("Twin Peaks Pembroke Pines"); and 2224 Palm Beach Lakes Boulevard, West Palm Beach, Florida 33409 ("Twin Peaks West Palm Beach").

2.  Wimble, Perez and Castaneda were adversely impacted and otherwise damaged by the DMD Corporate Family's violations of federal and state law. Specifically:

   a.  Wimble and Perez were subjected to a hostile work environment, in violation of Title VII and the FCRA, when a manager and customers directed sexually-harassing behavior toward the women. [Counts I-IV]

   b.  The DMD Corporate Family violated Title VII, the PDA, the ADA and the FRCA when it discriminated against Castaneda by refusing to re-hire her as a Twin Peaks Girl because of her pregnancy or pregnancy-related impairment. [Counts V-VII]

---

[1] DMD Ventures plans to open Twin Peaks franchises in Hollywood, Fort Lauderdale and Naples, Florida. See Michael Mayo, "Whiskey Tango closes in Hollywood, Twin Peaks (with new balcony bar?) on the way," *South Florida Sun Sentinel* website (July 3, 2019), available at: https://www.sun-sentinel.com/entertainment/restaurants-and-bars/fl-et-whiskey-tango-twin-peaks-hollywood-20190703-nqevvlhygzdzvizay6br2ixu2e-story.html (visited Dec. 10, 2019).

[2] For purposes of this Complaint, "DMD" refers to the corporate entity that owns and operates the restaurant and "Twin Peaks Davie" refers to the restaurant and physical space.

c.   The DMD Corporate Family violated the FLSA when it underpaid Wimble, Perez and Castaneda for pre-shift activities and mandatory uniform and costume costs. [Counts VIII-IX]

d.   DMD violated Wimble's expectation of privacy when it used an imaging device to film her while she dressed, undressed or privately exposed her body in a changing room at Twin Peaks Davie. [Count X]

e.   Wimble, Perez and Castaneda were subject to third-party retaliation from the DMD Corporate Family. In particular, in retaliation for the protected activity (i.e., filing a Charge of Discrimination) of Michael Buckner (who was, and is, Wimble, Perez and Castaneda's lawyer), the DMD Corporate Family barred him from its restaurants on a pre-textual reason. [Count XI]

**PARTIES, JURISDICTION AND VENUE**

3.   Wimble, who is a current resident of Miami-Dade County, Florida, is a former employee of DMD (and the DMD Corporate Family under the joint employer theory). Wimble worked as a Twin Peaks Girl in the role of server at Twin Peaks Davie from approximately July 2016 to approximately December 2018 (Wimble issued her two-week notice on December 1, 2018).

4.   Perez, who is a current resident of Miami-Dade County, Florida, is a former employee of DMD (and the DMD Corporate Family under the joint employer theory). Wimble worked as a Twin Peaks Girl in the role of server at Twin Peaks Davie from on or about August 9, 2017, to approximately December 2018 (Perez issued her two-week notice on December 7, 2018).

5.     Castaneda, who is a current resident of Broward County, Florida, is a former employee of DMD (and the DMD Corporate Family under the joint employer theory). Castaneda worked as a Twin Peaks Girl in the role of server at Twin Peaks Davie from approximately January 2016 to approximately December 2017 and from approximately March 2018 to on or about April 28, 2018 and Twin Peaks Pembroke Pines from approximately January 2018 to approximately February 2018.

6.     DMD is a Florida limited liability company with its principle place of business in Davie, Broward County, Florida. DMD operates Twin Peaks Davie. At all times relevant herein, DMD employed at least fifteen persons, and was therefore an "employer" within the meaning of federal and state discrimination and wage laws.

7.     DMD Florida is a Florida limited liability company with its principle place of business in Davie, Broward County, Florida. DMD Florida is the managing member of DMD. Further, DMD Florida is a joint employer and operates as a joint enterprise with DMD and DMD-related business entities. Therefore, at all times relevant herein, DMD Florida is an "employer" within the meaning of federal and state discrimination and wage statutes and common law.

8.     DMD Restaurant Group is a Florida limited liability company with its principle place of business in Davie, Broward County, Florida. DMD Restaurant Group is the registered owner in Florida of the fictitious name "Twin Peaks Restaurant" and has a multiple-store agreement to develop Twin Peaks restaurants in Miami, Fort Lauderdale, Boca Raton and West Palm Beach. Further, DMD Restaurant Group is the managing member of DMD Florida and is a joint employer and operates as a joint enterprise with DMD and DMD-related business entities.

Therefore, at all times relevant herein, DMD Restaurant Group is an "employer" within the meaning of federal and state discrimination and wage statutes and common law.

9.      DMD Ventures is a Florida limited liability company with its principle place of business in Davie, Broward County, Florida. DMD Ventures develops, owns and operates restaurants, including Twin Peaks Davie, throughout Florida. Further, DMD Ventures is the managing member of DMD Restaurant Group. Therefore, DMD Ventures is a joint employer and operates as a joint enterprise with DMD and DMD-related business entities. Therefore, at all times relevant herein, DMD Florida is an "employer" within the meaning of federal and state discrimination and wage statutes and common law.

10.     The jurisdiction of this Court is predicated upon 29 U.S.C. § 1331 as this case involves questions of federal law. Further, this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Wimble, Perez and Castaneda's state law claims also share all common operative facts with their federal law claims, and the parties are identical. Further, this Court's resolution of Wimble, Perez and Castaneda's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency and fairness to the parties.

11.     Venue is proper in the United States District Court for the Southern District of Florida, pursuant to 28 U.S.C. § 1391(b), wherein: (a) the violations of federal and state statutes and common law occurred in this District; and (b) the DMD Corporate Family conducts business operations and operates restaurant facilities in this District.

## FULFILLMENT OF ADMINISTRATIVE AND STATUTORY PREREQUISITES

12.     Wimble, Perez and Castaneda timely filed Charges of Discrimination with the

5

United States Equal Employment Opportunity Commission ("EEOC").

13.    On September 11, 2019, the EEOC issued Wimble, Perez and Castaneda their Notices of Right to Sue.

14.    Wimble, Perez and Castaneda have timely filed this action and have complied with all administrative and statutory prerequisites to bring this lawsuit.

## WIMBLE, PEREZ AND CASTANEDA'S FLSA ELIGIBILITY: ENTERPRISE AND INDIVIDUAL COVERAGE

15.    Wimble, Perez and Castaneda are eligible for FLSA enterprise coverage for two reasons. First, DMD, individually, and the DMD Corporate Family, collectively, has more than 50 employees engaged in the sale, preparation and service of food, alcohol and beverages, which were delivered to Twin Peaks Davie from jurisdictions outside of the state of Florida. Second, based on information and belief, beverage and alcohol sales at DMD, individually, and the DMD Corporate Family, collectively, generated gross revenue of at least $500,000 during each of the 2016, 2017 and 2018 calendar years.

16.    Wimble, Perez and Castaneda are eligible for FLSA individual coverage since they, as Twin Peaks Girls, regularly and directly participated in the service of food, alcohol and beverages, which were delivered to Twin Peaks Davie from jurisdictions outside of the state of Florida.

## DMD CORPORATE FAMILY: JOINT ENTERPRISE AND JOINT EMPLOYER

17.    DMD, DMD Florida, DMD Restaurant Group and DMD Ventures, which operate as a joint enterprise, are subject to the requirements of the FLSA. Further, DMD, DMD Florida, DMD Restaurant Group and DMD Ventures, which operated as the joint employers of Wimble, Perez and Castaneda, are jointly and severally liable for federal and state statutory and common

law violations. Specifically, DMD, DMD Florida, DMD Restaurant Group and DMD Ventures operate as a joint enterprise and joint employer since the entities performed related activities through a complex, but unified operation, as well as common control for a common business purpose in six ways.

18.     First, DMD Ventures has acknowledged publicly the extent of its ownership and control of the entities within the DMD Corporate Family. Specifically, on its website[3], DMD Ventures declared it "develops, owns and operates restaurants, retail shopping centers and limited service hotels throughout the State of Florida. Through our subsidiary companies, we own and operate some of the fastest growing restaurant brands in the United States with locations throughout Florida. … We operate some of the most exciting restaurant and hotel brands in the United States, like Twin Peaks Restaurants and IHG Hotels. Through our subsidiary companies, we have developed and managed various retail shopping centers and limited service hotel projects across South Florida and Orlando, Florida." Further, DMD Ventures has been described in the media as the owner the Twin Peaks franchises in the area[4].

19.     Second, DMD Ventures directors and officers used, and continue to use, DMD Restaurant Group to operate, and have common control over, its Twin Peaks franchises. Specifically, DMD Restaurant Group was founded in 2012 by Jack Flechner ("Flechner"), DMD Ventures director and chief executive officer, and Fred Burgess ("Burgess"), DMD Ventures director and president, to oversee DMD Ventures' restaurant brands and real estate development

---

[3] "About Us," DMD Ventures website (n.d.), available at: http://www.dmd.ventures/about-us.html (visited Dec. 9. 2019).
[4] See Michael Mayo, "Whiskey Tango closes in Hollywood, Twin Peaks (with new balcony bar?) on the way," South Florida Sun Sentinel (July 3, 2019), available at: https://www.sun-sentinel.com/entertainment/restaurants-and-bars/fl-et-whiskey-tango-twin-peaks-hollywood-20190703-nqevvlhygzdzvizay6br2ixu2e-story.html   (visited   Dec. 10, 2019) ("The same franchise group that owns the other three South Florida locations, DMD Ventures, is aligning with Taillard to bring Twin Peaks to Hollywood.").

projects throughout Florida.[5] In fact, DMD Restaurant Group is the registered owner in Florida of the fictitious name "Twin Peaks Restaurant" and has a multiple-store agreement to develop Twin Peaks restaurants in Miami, Fort Lauderdale, Boca Raton and West Palm Beach.

20.     Third, DMD Ventures and its subsidiaries serve as the managing member of the entity below it in the corporate structure:

    a.     DMD Florida is the managing member of DMD.

    b.     DMD Restaurant Group is the managing member of DMD Florida.

    c.     DMD Ventures is the managing member of DMD Restaurant Group.

21.     Fourth, DMD Restaurant Group, Flechner and Burgess serve as registered agents for other business entities within the DMD Corporate Family. For example:

    a.     Flechner is the registered agent for DMD and DMD Ventures.

    b.     DMD Restaurant Group is the restaurant agent for DMD Florida.

    c.     Burgess is the registered agent for DMD Restaurant Group.

22.     Fifth, except for DMD, the business entities of the DMD Corporate Family share the same principle place of business in Davie, Broward County, Florida.

23.     Sixth, DMD Ventures (through DMD Restaurant Group, Flechner, Burgess and others) provided, and continue to provide, direction for, and engage in the daily operations of, DMD. For example:

    a.     DMD Ventures maintains personnel records for Twin Peaks Davie employees.

---

[5] See "West Palm Beach Twin Peaks Restaurant Opens Today," Twin Peaks website (n.d.), available at: https://api.twinpeaksrestaurant.com/wp-content/uploads/West-Palm-Beach-TP-opening-release-FINAL.pdf (visited Dec. 9. 2019); "Twin Peaks Begins South Florida Expansion," Franchising.com (June 13, 2014), available at: https://www.franchising.com/news/20140613_twin_peaks_begins_south_florida_expansion.html (visited Dec. 9. 2019); "Twin Peaks Announces 10-Store Development Agreement in Miami," Franchising.com (Nov. 8, 2012), available at: https://www.franchising.com/news/20121108_twin_peaks_announces_10store_development_agreement.html (visited Dec. 9. 2019).

b.  Flechner and Burgess engaged in various roles, and directed others, to assist in the operations of Twin Peaks Davie, including supervising managers, coordinating the purchase of Twin Peaks franchises' multi-video systems[6], revising the Twin Peaks uniform and image standards and protocols[7], setting policies and deciding on the banishment of customers from its restaurants.

c.  Flechner and Burgess are referred to by managers and staff at Twin Peaks Davie as the "owners" of DMD.

d.  Austin Hester ("Hester"), chief operating officer and "partner" at "Twin Peaks" and DMD Restaurant Group[8], and Karena Korokous ("Korokous"), DMD Restaurant Group director of training and human resources manager[9], possessed, and currently possesses, authority into the hiring and termination of Twin Peaks Girls.

e.  Korokous conducted general training sessions and monitored employees' compliance with the Twin Peaks uniform and image standards and protocols.

---

[6]   See, e.g., "Constrology/Twin Peaks Restaurant," Panasonic website (n.d.), https://panasonic.net/cns/prodisplays/casestudies/043 (visited Dec. 9. 2019).

[7] Wimble recalls Flechner and/or Burgess revised the Twin Peaks uniform and image standards and protocols a few months after her hiring. Specifically, Wimble recalled, under the revised standard, Twin Peaks Girls were required to wear: (1) uniform stops that exposed more of the employee's mid-section; and (2) "bling" jewelry.

[8] "Austin Hester," LinkedIn (n.d.), available at: https://www.linkedin.com/in/austin-hester-b4b60314 (visited Dec. 9. 2019).

[9] "Karena Korokous," LinkedIn (n.d.), available at: https://www.linkedin.com/in/karena-korokous-0364bb7b (visited Dec. 9. 2019).

## GENERAL ALLEGATIONS

### Twin Peaks Concept, Operations and Uniforms

24.     Twin Peaks is an American chain of sports bars and restaurants with servers and bartenders called "Twin Peaks Girls." The restaurants feature a mountain sports-lodge setting and Twin Peaks Girls dressed in revealing uniforms that consist of cleavage- and midriff-revealing red plaid (or other seasonal or themed) tops, as well as khaki short shorts.

25.     Twin Peaks Girls were non-exempt employees for purposes of the FLSA. Thus, the DMD Corporate Family paid Twin Peaks Girls the prevailing Florida tipped minimum wage (instead of the state regular minimum wage) and the DMD Corporate Family took the $3.02 tip credit (as permitted under the FLSA, the state minimum wage statute and Florida agency determinations).

26.     The DMD Corporate Family required Twin Peaks Girls, including Wimble, Perez and Castaneda, to follow certain personnel policies, including, but not limited to, the Twin Peaks uniform and image standards and protocols. Under the Twin Peaks uniform and image standards and protocols, Twin Peaks Girls were required to wear the Twin Peaks-branded uniform (with accessories), as well as dress in custom-made costumes (with accessories) during designated holidays, special events and "costume parties." Twin Peaks Girls were required to incur the costs of the uniform, costumes and accessories, but did not receive a stipend, reimbursement or other form compensation from the DMD Corporate Family to pay for such costs.

27.     During their employment at Twin Peaks Davie, Wimble, Perez and Castaneda did not recall receiving an employee handbook, a written anti-harassment policy or a written complaint/grievance procedure. Further, prior to November 10, 2018, Wimble, Perez and

Castaneda did not recall the DMD Corporate Family conducted a training session on sexual harassment-related issues.

28.     Wimble, Perez and other Twin Peaks Girls worked in an environment that included regular and repeated sexual touching and grabbing, lewd sexual comments and other offensive and threatening behaviors by a manager and customers.

<u>Allegations Relating to Castaneda</u>

29.     In approximately January 2016, Castaneda started as a Twin Peaks Girl (in the position of server) at Twin Peaks Davie.

30.     Castaneda was temporarily transferred to Twin Peaks Pembroke Pines from approximately January 2018 to approximately February 2018.

31.     In approximately March 2018, Castaneda learned she was pregnant. During her first trimester, Castaneda experienced depression. Castaneda contemplated resigning as a Twin Peaks Girl so she could concentrate on her mental condition and the pregnancy.

32.     In early April 2018, Castaneda sent an email through DMD's HotSchedules system to Eric Boucher ("Boucher"), the Twin Peaks Davie general manager, and the other location's managers. In the email, Castaneda indicated that she would resign due to her medical situation. Approximately two minutes after Castaneda sent the email, Boucher called and urged her not to quit. Boucher also requested that Castaneda think about her decision.

33.     On May 4, 2018, Castaneda texted Boucher with her decision to resign her employment.

34.     Castaneda subsequently learned her unborn child suffered from serious medical issues.

35.     On or about August 1, 2018, Castaneda lost her child.

36.     On August 13, 2018, Castaneda texted Boucher seeking to be re-hired.

37.     On or about August 14, 2018. Castaneda visited Twin Peak Davie and talked to Boucher. Castaneda informed Boucher about her pregnancy, medical complications and losing her child. Castaneda asked Boucher if she could work at Twin Peaks Davie again. Boucher informed Castaneda: "I would love to have you, but you know what they're going to tell me about your weight." Castaneda informed him the weight gain was due to complications from the pregnancy. Boucher suggested that Castaneda come back in one week to apply.

38.     On August 20, 2018, Castaneda returned to Twin Peaks Davie to officially apply to be re-hired. Per standard operating procedure, Castaneda took photographs in the Twin Peak Girl uniform. Boucher directed Castaneda to call the next day. Castaneda asked Boucher who would decide on her re-hiring. Boucher informed Castaneda that Hester and Korokous would make the decision.

39.     On August 21, 2018, Castaneda called Boucher, who informed her: "You are not going to like it." Boucher then stated: "Yeah, unfortunately, they said the weight is the issue and that you would need to lose weight to come back." Boucher also said: "You know it's not me and I would love to have you. It's them with the decision." Boucher advised Castaneda to come back in a month if she could lose weight.

40.     On September 19, 2018, Castaneda mailed to the EEOC a Charge of Discrimination involving the DMD Corporate Family.

41.     On October 1, 2018, the EEOC notified the DMD Corporate Family of Castaneda's Charge of Discrimination.

<u>Allegations Relating to Wimble</u>

42.    In approximately July 2016, Wimble started as a Twin Peaks Girl (in the position of server) at Twin Peaks Davie.

43.    In approximately May 2018, Thomas "Tom" Kridos ("Kridos"), then an assistant manager at Twin Peaks Davie, began touching Wimble's hips (and, thereafter, holding on for several seconds) whenever she asked for assistance in his role as manager. Wimble felt uncomfortable during the contacts.

44.    After Kridos returned from vacation in early June 2018, he increased his sexual harassment by touching Wimble's buttocks whenever she asked for his assistance. Kridos touched Wimble's hips or buttocks approximately six times per shift. Kridos disguised his inappropriate actions by making the contacts appear accidental.

45.    However, Wimble's did not immediately disclose Kridos' actions to human resources because she feared hostility from Kridos (since her working relationship with Kridos required her to interact with him numerous times each shift).

46.    Further, Wimble noted the futility of reporting due to Perez's history with Kridos. Specifically, Kridos was reprimanded or admonished once for inappropriate sexual comments directed toward Perez. Despite knowing of this harassment, the DMD Corporate Family failed to ensure Perez did not work with Kridos. The DMD Corporate Family also did not follow-up with Perez to ensure she was not subject to further harassment from Kridos. The DMD Corporate Family's errors enabled Kridos to continue his illicit behavior, including engaging in inappropriate physical contact with Perez.

47.    On Sunday, June 10, 2018, Wimble worked the night shift. A customer asked Wimble to change the channel on a television in the restaurant. Wimble approached Kridos, who

was standing at the well of the inside bar and asked him to change the television. Wimble waited for Kridos to do so. After Kridos made the channel change, Kridos and Wimble crossed paths to walk to other portions of the restaurant. As Wimble walked past him, Kridos' hand brushed her vagina. In response, Wimble pushed Kridos very hard. Kridos did not react, but kept walking away from Wimble.

48.     Wimble subsequently informed colleagues of Kridos' illicit contacts. Wimble's also asked another assistant manager about how to disclose the incident to the DMD Corporate Family. The assistant manager informed Wimble to submit the complaint in writing to human resources.

49.     On June 11, 2018, Kridos was terminated (or resigned).

50.     In a pre-suit settlement offer letter dated July 16, 2018, Wimble, through her legal counsel, reported Kridos' sexually-harassing behavior to the DMD Corporate Family.

51.     On September 19, 2018, Wimble mailed to the EEOC a Charge of Discrimination involving the DMD Corporate Family.

52.     On October 1, 2018, the EEOC notified the DMD Corporate Family of Wimble's Charge of Discrimination.

53.     Prior to November 10, 2018, Wimble did not recall the DMD Corporate Family providing anti-sexual harassment training or education on how to report instances of sexual harassment.

54.     On November 10, 2018, the DMD Corporate Family held a mandatory training session on harassment. Wimble attended the session. The session was conducted by a lawyer and was attended by managers and employees. The session started with a sexual joke from the TV show *Seinfeld*. The joke revolved around rhyming the word "clitoris." During the session, the

lawyer requested the attendees to discuss issues with customers. At least twenty percent of the Twin Peaks Girls raised their hands to discuss issues they had with customers and why certain persons should not be allowed in the restaurant. After a few Twin Peaks Girls' comments, the lawyer stopped answering questions on the topic. The session was videotaped by the DMD Corporate Family.

55.     On December 1, 2018, Wimble issued a two-week notice to DMD. Her last day occurred approximately two weeks later in December 2018.

<u>Allegations Relating to Perez</u>

56.     On or about August 9, 2018, Perez started as a Twin Peaks Girl (in the position of server) at Twin Peaks Davie.

57.     In late November 2017, Perez first met Kridos in "pep rally," which is the pre-shift meeting for servers and bartenders. After the conclusion of the pep rally, Perez was standing by a computer station and talking with other employees. Perez started chocking because she was laughing very hard at what was being said during the conversation. Kridos approached Perez and said, "easy tiger" and indicated he would be more than happy to give her "CPR." Kridos also said other inappropriate things to Perez.

58.     After Kridos walked by, Perez and the other Twin Peaks Girls involved in the conversation were talking about what Kridos said. Brooke Evans ("Evans"), a then-assistant manager at Twin Peaks Davie, walked by the group and asked: "What's up?" Perez informed Evans what occurred. Evans took Perez to the back of the restaurant and directed her to write her complaint on a piece of paper.

59.     The DMD Corporate Family did not conduct an investigation of Perez's complaint. For example, the DMD Corporate Family did not assign an investigator to the case and failed to schedule interviews with Perez, Kridos and witnesses to obtain detailed statements.

60.     On Perez's next shift, Dave Flowers ("Flowers"), then-manager, sat down with Perez for approximately five minutes and reassured her that Kridos' actions would not happen again. Flowers promised Perez that he would talk to Kridos.

61.     Thereafter, Perez felt the DMD Corporate Family neglected to implement measures designed to prevent or correct the sexually-harassing behavior of Kridos and customers. Perez also believed the DMD Corporate Family retaliated against her by scheduling Perez to work with Kridos in undesirable assignments or shifts (i.e., closing shifts in which Kridos was the only manager on duty).

62.     In the months afterwards, Kridos did not speak with, or look at, Perez when she worked with him. Perez had to close the restaurant with Kridos on numerous occasions—one manager was assigned to close the restaurant.

63.     After Evans was reassigned as the general manager of Twin Peaks West Palm Beach, Kridos resumed his sexually-harassing behavior toward Perez. For example, on one occasion, Kridos told Perez the "things I would've done if I were a few years younger." At this time, Kridos began touching Perez. Kridos placed his hand on Perez's waist, hips, thighs and buttocks over a span of several months. Kridos made it appear the touching was accidental. Perez told Kridos not to touch her. In response, Kridos would say "my bad", "it's tight in here" or "just trying to squeeze through." Kridos' touching occurred at the expo line, computer stations and other places in the restaurant.

64.     Perez did not report Kridos' actions since no one from the DMD Corporate Family followed-up and no one from the DMD Corporate Family appeared to care about her. With Evans no longer at the restaurant, Perez also felt she would be fired if she was reported Kridos. In fact, on one occasion, Kridos boasted to Perez that he was "safe"; he had five years left with the company; and he could not be fired.

65.     On September 19, 2018, Perez mailed to the EEOC a Charge of Discrimination involving the DMD Corporate Family.

66.     On October 1, 2018, the EEOC notified the DMD Corporate Family of Perez's Charge of Discrimination.

67.     On November 10, 2018, Perez attended a mandatory (and recorded) training session on sexual harassment. Perez recalled the speaker, who was a lawyer, excused drunken customers who were inappropriate to Twin Peaks Girls since he argued it was not the customers' fault because they were inebriated. Perez was appalled and shocked that a DMD Corporate Family lawyer would excuse inappropriate sexual behavior by customers.

68.     On December 7, 2018, Perez issued a two-week notice to DMD. Her last day occurred approximately two weeks later in December 2018.

### COUNT I
### WIMBLE AND PEREZ: TITLE VII SEXUAL HARASSMENT—
### HOSTILE WORK ENVIRONMENT: MANAGER
### (DMD CORPORATE FAMILY)

69.     Wimble and Perez re-allege each and every allegation contained in paragraphs 1-28 and 42-68, as if they were fully set forth herein.

70.     Wimble and Perez assert this claim, which is based on Title VII, against the DMD Corporate Family when it failed to exercise reasonable care to prevent and correct promptly the sexually-harassing behavior of Kridos.

71.     Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The United States Supreme Court determined that sexual harassment is a form of sex discrimination prohibited by Title VII. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986). Further, federal courts recognize sexual harassment can occur in a hostile work environment, which are based on "bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 751 (1998).

72.     Perez and Wimble were employed by the DMD Corporate Family as Twin Peaks Girls. Specifically, Wimble was employed from approximately July 2016 to approximately December 2018, and Perez from August 9, 2017, to approximately December 2018.

73.     The DMD Corporate Family possessed, and currently possesses, an employee handbook for its Twin Peaks restaurants. The employee handbook contains a written anti-harassment policy, which: (a) prohibits sexual harassment in the workplace; and (b) directs employees to report any harassment to a particular person or office.

74.     However, despite the existence of an employee handbook, the DMD Corporate Family, did not exercise, and does not exercise, reasonable care to prevent and correct promptly sexually-harassing behavior. For example, until November 10, 2018, Wimble and Perez do not recall being provided a copy of the employee handbook, educated on anti-sexual harassment policies or trained on how to report instances of sexual harassment.

75.     Further, the DMD Corporate Family's anti-harassment policy was not effective on several levels:

      a.      The conduct of Kridos was not unique and impacted more than one female employee.

      b.      Kridos was reprimanded or admonished once for inappropriate sexual comments directed toward Perez within a short time after his start as a manager at the location. However, despite knowing of this harassment, the DMD Corporate Family failed to ensure Perez did not work with Kridos. This error enabled Kridos to continue his illicit behavior, including engaging in inappropriate physical contact with Perez.

      c.      Perez informed Wimble concerning Kridos' prior reprimand or admonishment, as well as his current sexually-harassing behavior. As a result, Wimble did not feel confident that reporting sexually-harassing behavior would prevent or correct Kridos' sexually-harassing behavior.

76.     During a portion of Perez and Wimble's employment, the DMD Corporate Family discriminated against them because of their sex and gender (female). Further, Wimble and Perez were subject to unwelcome sexual harassment in the form of regular and repeated sexual touching and grabbing, lewd sexual comments, and other offensive and threatening behaviors by Kridos:

      a.      For instance, in 2017, Perez reported to a DMD manager the sexually-harassing behavior of Kridos.

      b.      In response, the DMD Corporate Family failed to conduct a comprehensive investigation of her complaint; neglected to implement measures designed to prevent or correct the sexually-harassing behavior of Kridos and customers; and retaliated against Perez.

c.     Although the DMD Corporate Family reprimanded or admonished Kridos for his inappropriate sexual comments directed toward Perez, DMD managers retaliated against Perez.

d.     For example, DMD managers scheduled Perez to work with Kridos in undesirable assignments or shifts (i.e., closing shifts in which Kridos was the only manager on duty).

e.     Further, DMD managers did nothing to ensure Kridos did not continue his sexually-harassing behavior; as a result, during numerous shifts at Twin Peaks Davie in the spring and summer of 2018, Kridos touched the waist, hips, thighs and buttocks of Perez without her permission.

f.     Also, Kridos made other inappropriate sexual comments concerning Perez, including telling her the "things I would've done if I were a few years younger."

g.     Finally, Wimble was the victim of sexually-harassing behavior by Kridos. Specifically, Kridos, during numerous shifts at Twin Peaks Davie in May and June 2018, touched the hips, buttocks and vagina of Wimble without her permission.

77.     Kridos' harassment of Perez and Wimble was based upon sex and included acts directed toward the women due to, or because of, their gender, including repeated touching of the women's body parts. In fact, Kridos touched the waist, hips, thighs and buttocks of Perez without her permission in the spring and summer of 2018 and the hips, buttocks and vagina of Wimble without her permission during May and June 2018.

78.     Kridos' sexually-harassing behavior suffered by Perez and Wimble went beyond mere socializing, flirting and similar behavior and obligated the women to work in an environment in which the manager repeatedly inappropriately touched Perez and Wimble and made several sexualized comments to Perez that was distinctly different than what they originally agreed to when their employment started at Twin Peaks Davie.

79.     The DMD Corporate Family was responsible for that environment under the theories of either vicarious or direct liability:

a.      The DMD Corporate Family was vicariously liable for the acts of Kridos because his sexually-harassing behavior occurred: (i) within the scope of his employment as a DMD manager; or (ii) during the course of his employment as a DMD manager and to further a purpose or interest of the employer. In fact, on one occasion during the summer of 2018, Kridos informed Perez that he was "safe" since he had five years left with the company, so he could not be fired.

b.      The DMD Corporate Family was accountable for Kridos' sexually-harassing behavior through its own negligence. Specifically, the DMD Corporate Family negligently retained Kridos after first learning of his sexually-harassing behavior and failed to follow-up with Perez to monitor his conduct.

80.     As a direct, legal and proximate result of the DMD Corporate Family's discrimination, Wimble and Perez sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

81.     The DMD Corporate Family's unlawful actions were intentional, willful, malicious and/or done with reckless disregard to Wimble and Perez's right to be free from sexual harassment discrimination.

**COUNT II**
**WIMBLE AND PEREZ: FCRA SEXUAL HARASSMENT—**
**HOSTILE WORK ENVIRONMENT: MANAGER**
**(DMD CORPORATE FAMILY)**

82.     Wimble and Perez re-allege each and every allegation contained in paragraphs 1-28 and 42-68, as if they were fully set forth herein.

83.     Wimble and Perez assert this claim, which is based on the FCRA, against the DMD Corporate Family when it failed to exercise reasonable care to prevent and correct promptly the sexually-harassing behavior of Kridos.

84.     The FCRA (Section 760.10(1), Florida Statutes) makes it unlawful for an employer:

(a)   To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status.

(b)   To limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or adversely affect any individual's status as an employee, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status.

85.     Perez and Wimble were employed by the DMD Corporate Family as Twin Peaks Girls. Specifically, Wimble was employed from approximately July 2016 to approximately December 2018, and Perez from August 9, 2017, to approximately December 2018.

86.     The DMD Corporate Family possessed, and currently possesses, an employee handbook for its Twin Peaks restaurants. The employee handbook contains a written anti-

harassment policy, which: (a) prohibits sexual harassment in the workplace; and (b) directs employees to report any harassment to a particular person or office.

87.     However, despite the existence of an employee handbook, the DMD Corporate Family, did not exercise, and does not exercise, reasonable care to prevent and correct promptly sexually-harassing behavior. For example, until November 10, 2018, Wimble and Perez do not recall being provided a copy of the employee handbook, educated on anti-sexual harassment policies or educated on how to report instances of sexual harassment.

88.     Further, the DMD Corporate Family's anti-harassment policy was not effective on several levels:

a.     The conduct of Kridos was not unique and impacted more than one female employee.

b.     Kridos was reprimanded or admonished once for inappropriate sexual comments directed toward Perez within a short time after his start as a manager at the location. However, despite knowing of this harassment, the DMD Corporate Family failed to ensure Perez did not work with Kridos. This error enabled Kridos to continue his illicit behavior, including engaging in inappropriate physical contact with Perez.

c.     Perez informed Wimble concerning Kridos' prior reprimand or admonishment, as well as his current sexually-harassing behavior.

d.     As a result, Wimble did not feel confident that reporting sexually-harassing behavior would prevent or correct Kridos' sexually-harassing behavior.

23

89.     During a portion of Perez and Wimble's employment, the DMD Corporate Family discriminated against them because of their sex and gender (female). Further, Wimble and Perez were subject to unwelcome sexual harassment in the form of regular and repeated sexual touching and grabbing, lewd sexual comments, and other offensive and threatening behaviors by Kridos:

a.      For instance, in 2017, Perez reported to a DMD manager the sexually-harassing behavior of Kridos.

b.      In response, the DMD Corporate Family failed to conduct a comprehensive investigation of her complaint; neglected to implement measures designed to prevent or correct the sexually-harassing behavior of Kridos and customers; and retaliated against Perez.

c.      Although the DMD Corporate Family reprimanded or admonished Kridos for his inappropriate sexual comments directed toward Perez, DMD managers retaliated against Perez.

d.      For example, DMD managers scheduled Perez to work with Kridos in undesirable assignments or shifts (i.e., closing shifts in which Kridos was the only manager on duty).

e.      Further, DMD managers did nothing to ensure Kridos did not continue his sexually-harassing behavior; as a result, during numerous shifts at Twin Peaks Davie in the spring and summer of 2018, Kridos touched the waist, hips, thighs and buttocks of Perez without her permission.

f.      Also, Kridos made other inappropriate sexual comments concerning Perez, including telling her the "things I would've done if I were a few years younger."

g.      Finally, Wimble was the victim of sexually-harassing behavior by Kridos. Specifically, Kridos, during numerous shifts at Twin Peaks Davie in May and June 2018, touched the hips, buttocks and vagina of Wimble without her permission.

90.      Kridos' harassment of Perez and Wimble was based upon sex and included acts directed toward the women due to, or because of, their gender, including repeated touching of the women's body parts. In fact, Kridos touched the waist, hips, thighs and buttocks of Perez without her permission in the spring and summer of 2018 and the hips, buttocks and vagina of Wimble without her permission during May and June 2018.

91.      Kridos' sexually-harassing behavior suffered by Perez and Wimble went beyond mere socializing, flirting and similar behavior and obligated the women to work in an environment in which the manager repeatedly inappropriately touched Perez and Wimble and made several sexualized comments to Perez that was distinctly different than what they originally agreed to when their employment started at Twin Peaks Davie.

92.      The DMD Corporate Family was responsible for that environment under the theories of either vicarious or direct liability:

a.      The DMD Corporate Family was vicariously liable for the acts of Kridos because his sexually-harassing behavior occurred: (i) within the scope of his employment as a DMD manager; or (ii) during the course of his employment as a DMD manager and to further a purpose or interest of the

employer. In fact, on one occasion during the summer of 2018, Kridos informed Perez that he was "safe" since he had five years left with the company, so he could not be fired.

b.     The DMD Corporate Family was accountable for Kridos' sexually-harassing behavior through its own negligence. Specifically, the DMD Corporate Family negligently retained Kridos after first learning of his sexually-harassing behavior and failed to follow-up with Perez to monitor his conduct.

93.     As a direct, legal and proximate result of the DMD Corporate Family's discrimination, Wimble and Perez sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

94.     The DMD Corporate Family's unlawful actions were intentional, willful, malicious and/or done with reckless disregard to Wimble and Perez's right to be free from sexual harassment discrimination.

### COUNT III
### WIMBLE AND PEREZ: TITLE VII SEXUAL HARASSMENT—
### HOSTILE WORK ENVIRONMENT: CUSTOMERS
### (DMD CORPORATE FAMILY)

95.     Wimble and Perez re-allege each and every allegation contained in paragraphs 1-28 and 42-68, as if they were fully set forth herein.

96.     Wimble and Perez assert this claim, which is based on Title VII, against the DMD Corporate Family when it failed to exercise reasonable care to prevent and correct promptly the sexually-harassing behavior of customers.

97.     Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The United States Supreme Court has determined that sexual harassment is a form of sex discrimination prohibited by Title VII. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986). Further, federal courts recognize sexual harassment can occur in a hostile work environment, which are based on "bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 751 (1998).

98.     Perez and Wimble were employed by the DMD Corporate Family as Twin Peaks Girls. Specifically, Wimble was employed from approximately July 2016 to approximately December 2018, and Perez from August 9, 2017, to approximately December 2018.

99.     The DMD Corporate Family possessed, and currently possesses, an employee handbook for its Twin Peaks restaurants. The employee handbook contains a written anti-harassment policy, which: (a) prohibits sexual harassment in the workplace; and (b) directs employees to report any harassment to a particular person or office.

100.     However, despite the existence of an employee handbook, the DMD Corporate Family, did not exercise, and does not exercise, reasonable care to prevent and correct promptly sexually-harassing behavior. For example, Wimble and Perez do not recall being provided anti-sexual harassment training or educated on how to report instances of sexual harassment.

101.     Further, the DMD Corporate Family's anti-harassment policy was not effective on several levels:

      a.     The sexual-harassing behavior of customers was not unique and impacted more than one female employee.

      b.      DMD managers did not make any attempt to protect Wimble and Perez from customers' unwanted sexual touching even after Wimble and Perez reported the sexually-harassing behavior on numerous occasions.

102.    During a portion of Perez and Wimble's employment, the DMD Corporate Family discriminated against them because of their sex and gender (female). Specifically, Wimble and Perez were subject to unwelcome sexual harassment in the form of regular and repeated sexual touching and grabbing, lewd sexual comments, and other offensive and threatening behaviors by customers:

      a.      Over the course of Perez's employment, two white males (a father and son duo) visited the restaurant almost every Sunday at opening time and sat at Table No. 33. The men asked Twin Peaks Girls to take photos with them. However, Perez observed the men routinely take photographs of Twin Peaks Girls' breasts and butts without the girls' permission. The men stored the unsolicited photos in a lockbox on one of their smart phones. The unwanted photos were reported to DMD managers, who merely asked the men to delete the photos. Despite Perez and other Twin Peaks Girls feeling uncomfortable around the men, managers did not kick the men out of Twin Peaks Davie or banned the men from the restaurant for their behavior.

      b.      On one occasion in 2018, Alfreedo "Fred" (who has a nickname among staff as "Candyman"[10]) approached Wimble and said: "I heard you have your nipples pierced and I have a little gift for you." He then gave Wimble

_____

[10] Candyman received his nickname because he regularly brought candy or homemade goods to the restaurant for Twin Peaks Girls.

deviled nipple rings. Wimble threw the rings away. Wimble informed the managers. The managers did not kick out or bar Candyman from the restaurant for his behavior.

c.     On another occasion in November 2018, Candyman visited Twin Peaks Davie loitered (but did not purchase any item) in the restaurant to look at the Twin Peaks Girls. Candyman approached Perez and asked if she had a boyfriend or girlfriend. Perez informed him she had a boyfriend. Candyman then asked Perez when her boyfriend calls at 2:00 in the morning, "are you ready to fuck or say hello?" Perez was shocked, embarrassed and uncomfortable with the sexual nature of the conversation. Perez informed Wimble about the incident. Wimble and Perez informed a manager during "pep rally" the next day about the inappropriate comment. However, Candyman was not banned from the restaurant for his behavior.

d.     Twin Peaks Davie did not hire private firms or local law enforcement to provide security during most nights with major sporting events (e.g., UFC or boxing PPV, NFL playoffs) that create a maximum or near maximum capacity in the restaurant. As a result of no security, customers routinely grabbed Perez's butt when she walk by the bar rail. Since it was so crowded in the restaurant, Perez did not know who touched her. Whenever Perez reported the unwanted touching to the managers, Perez was informed "we're busy." DMD managers did not make any attempt to protect Perez from the unwanted sexual touching even after reported the conduct.

29

e.  A regular customer, Carlos Antonio Garcia Angel, said sexual things to Wimble and other Twin Peaks Girls. In fact, Angel attempted to turn every conversation with Wimble or other Twin Peaks Girls into a sexual one. On one occasion in early 2018, Angel brought in walnuts with condoms stuffed inside and passed the items out to Wimble and other Twin Peaks Girls. Wimble was offended. Despite reporting the behavior, the managers did not kick out or bar Angel from the restaurant for his behavior.

f.  During Snow Bunny Week 2017, Wimble and other Twin Peaks Girls were required to wear little short light pink and white costumes. The costumes were sexual in nature. One of the regular customers said to Wimble: "If you tell me your panty color" and "What color are they?" Wimble was offended at the sexual comment. The customer was not banned from the restaurant.

g.  In 2018, Brandon Pozo, a regular customer, was barred from Twin Peaks Davie for inappropriate sexual behavior.[11] However, Pozo was subsequently permitted back on the premises. Pozo was loud, obnoxious and creepy and grabbed Twin Peaks Girls by the arm. On a night near closing time in 2018, Pozo was very intoxicated and yelled to Wimble across the bar so other customers could hear: "You would fuck me for a $1,000 and don't act like you wouldn't." Wimble told the manager about the comment. However, Pozo was not kicked out of Twin Peaks Davie and was permitted to come back. Later in 2018, Pozo leered at Wimble, starred at her "creepy-wise" and would not stop looking at Wimble. Pozo also

---

[11] A Twin Peaks Girl informed Wimble about this incident.

exhibited the similar behavior to other Twin Peaks Girls, who reported the incidents to the managers. Pozo was not barred from the restaurant.

103.     The customers' harassment of Perez and Wimble was based upon sex and included acts directed toward the women due to, or because of, their gender, including sexually-harassing behavior.

104.     The customers' sexually-harassing behavior suffered by Wimble and Perez went beyond mere socializing, flirting and similar behavior and obligated the women to work in an environment in which customers made several sexualized comments to Wimble and Perez that was distinctly different than what they originally agreed to when their employment started at DMD.

105.     As a direct, legal and proximate result of the DMD Corporate Family's discrimination, Wimble and Perez sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

106.     The DMD Corporate Family's unlawful actions were intentional, willful, malicious and/or done with reckless disregard to Wimble and Perez's right to be free from sexual harassment discrimination.

## COUNT IV
## WIMBLE, PEREZ AND CASTANEDA: FCRA SEXUAL HARASSMENT—
## HOSTILE WORK ENVIRONMENT: CUSTOMERS
## (DMD CORPORATE FAMILY)

107.     Wimble and Perez re-allege each and every allegation contained in paragraphs 1-28 and 42-68, as if they were fully set forth herein.

108.     Wimble and Perez assert this claim, which is based on the FCRA, against the DMD Corporate Family when it failed to exercise reasonable care to prevent and correct promptly the sexually-harassing behavior of customers.

109.    The FCRA (Section 760.10(1), Florida Statutes) makes it unlawful for an employer:

(a)   To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status.

(b)   To limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or adversely affect any individual's status as an employee, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status.

110.    Perez and Wimble were employed by the DMD Corporate Family as Twin Peaks Girls. Specifically, Wimble was employed from approximately July 2016 to approximately December 2018, and Perez from August 9, 2017, to approximately December 2018.

111.    The DMD Corporate Family possessed, and currently possesses, an employee handbook for its Twin Peaks restaurants. The employee handbook contains a written anti-harassment policy, which: (a) prohibits sexual harassment in the workplace; and (b) directs employees to report any harassment to a particular person or office.

112.    However, despite the existence of an employee handbook, the DMD Corporate Family, did not exercise, and does not exercise, reasonable care to prevent and correct promptly sexually-harassing behavior. For example, Wimble and Perez do not recall being provided anti-sexual harassment training or educated on how to report instances of sexual harassment.

113.    Further, the DMD Corporate Family's anti-harassment policy was not effective on several levels:

    a.    The sexual-harassing behavior of customers was not unique and impacted more than one female employee.

      b.      DMD managers did not make any attempt to protect Wimble and Perez from customers' unwanted sexual touching even after Wimble and Perez reported the sexually-harassing behavior on numerous occasions.

114.    During a portion of Perez and Wimble's employment, the DMD Corporate Family discriminated against them because of their sex and gender (female). Specifically, Wimble and Perez were subject to unwelcome sexual harassment in the form of regular and repeated sexual touching and grabbing, lewd sexual comments, and other offensive and threatening behaviors by customers:

      a.      Over the course of Perez's employment, two white males (a father and son duo) visited the restaurant almost every Sunday at opening time and sat at Table No. 33. The men asked Twin Peaks Girls to take photos with them. However, Perez observed the men routinely take photographs of Twin Peaks Girls' breasts and butts without the girls' permission. The men stored the unsolicited photos in a lockbox on one of their smart phones. The unwanted photos were reported to DMD managers, who merely asked the men to delete the photos. Despite Perez and other Twin Peaks Girls feeling uncomfortable around the men, managers did not kick the men out of Twin Peaks Davie or banned the men from the restaurant for their behavior.

      b.      On one occasion in 2018, Alfreedo "Fred" (who has a nickname among staff as "Candyman"[12]) approached Wimble and said: "I heard you have your nipples pierced and I have a little gift for you." He then gave Wimble

---

[12] Candyman received his nickname because he regularly brought candy or homemade goods to the restaurant for Twin Peaks Girls.

deviled nipple rings. Wimble threw the rings away. Wimble informed the managers. The managers did not kick out or bar Candyman from the restaurant for his behavior.

c.     On another occasion in November 2018, Candyman visited Twin Peaks Davie loitered (but did not purchase any item) in the restaurant to look at the Twin Peaks Girls. Candyman approached Perez and asked if she had a boyfriend or girlfriend. Perez informed him she had a boyfriend. Candyman then asked Perez when her boyfriend calls at 2:00 in the morning, "are you ready to fuck or say hello?" Perez was shocked, embarrassed and uncomfortable with the sexual nature of the conversation. Perez informed Wimble about the incident. Wimble and Perez informed a manager during "pep rally" the next day about the inappropriate comment. However, Candyman was not banned from the restaurant for his behavior.

d.     Twin Peaks Davie did not hire private firms or local law enforcement to provide security during most nights with major sporting events (e.g., UFC or boxing PPV, NFL playoffs) that create a maximum or near maximum capacity in the restaurant. As a result of no security, customers routinely grabbed Perez's butt when she walk by the bar rail. Since it was so crowded in the restaurant, Perez did not know who touched her. Whenever Perez reported the unwanted touching to the managers, Perez was informed "we're busy." DMD managers did not make any attempt to protect Perez from the unwanted sexual touching even after reported the conduct.

e.      A regular customer, Carlos Antonio Garcia Angel, said sexual things to Wimble and other Twin Peaks Girls. In fact, Angel attempted to turn every conversation with Wimble or other Twin Peaks Girls into a sexual one. On one occasion in early 2018, Angel brought in walnuts with condoms stuffed inside and passed the items out to Wimble and other Twin Peaks Girls. Wimble was offended. Despite reporting the behavior, the managers did not kick out or bar Angel from the restaurant for his behavior.

f.      During Snow Bunny Week 2017, Wimble and other Twin Peaks Girls were required to wear little short light pink and white costumes. The costumes were sexual in nature. One of the regular customers said to Wimble: "If you tell me your panty color" and "What color are they?" Wimble was offended at the sexual comment. The customer was not banned from the restaurant.

g.      In 2018, Brandon Pozo, a regular customer, was barred from Twin Peaks Davie for inappropriate sexual behavior.[13] However, Pozo was subsequently permitted back on the premises. Pozo was loud, obnoxious and creepy and grabbed Twin Peaks Girls by the arm. On a night near closing time in 2018, Pozo was very intoxicated and yelled to Wimble across the bar so other customers could hear: "You would fuck me for a $1,000 and don't act like you wouldn't." Wimble told the manager about the comment. However, Pozo was not kicked out of Twin Peaks Davie and was permitted to come back. Later in 2018, Pozo leered at Wimble, starred at her "creepy-wise" and would not stop looking at Wimble. Pozo also

_____

[13] A Twin Peaks Girl informed Wimble about this incident.

exhibited the similar behavior to other Twin Peaks Girls, who reported the incidents to the managers. Pozo was not barred from the restaurant.

115.    The customers' harassment of Perez and Wimble was based upon sex and included acts directed toward the women due to, or because of, their gender, including sexually-harassing behavior.

116.    The customers' sexually-harassing behavior suffered by Wimble and Perez went beyond mere socializing, flirting and similar behavior and obligated the women to work in an environment in which customers made several sexualized comments to Wimble and Perez that was distinctly different than what they originally agreed to when their employment started at DMD.

117.    As a direct, legal and proximate result of the DMD Corporate Family's discrimination, Wimble and Perez sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

118.    The DMD Corporate Family's unlawful actions were intentional, willful, malicious and/or done with reckless disregard to Wimble and Perez's right to be free from sexual harassment discrimination.

**COUNT V**
**CASTANEDA: TITLE VII AND PDA**
**PREGNANCY DISCRIMINATION**
**(DMD CORPORATE FAMILY)**

119.    Castaneda re-alleges each and every allegation contained in paragraphs 1-41, as if they were fully set forth herein.

120.    Castaneda asserts this claim, which is based on Title VII and the PDA, against the DMD Corporate Family's discriminatory refusal to re-hire her as a Twin Peaks Girl. Specifically, the DMD Corporate Family refused to re-hire Castaneda because company officials believed her

post-pregnancy weight prevented her meeting a subjective fitness level and from performing as a Twin Peaks Girl. Further, the DMD Corporate Family did not treat Castaneda the same as all other employees who did not meet the company's desired subjective fitness level.

121.    Title VII makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . ." 42 U.S.C. § 2000e-2(a).

122.    In 1978, the United States Congress amended Title VII with the PDA to explicitly extend protection to pregnant women. Specifically, under the PDA, "[w]omen affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work...." 42 U.S.C. § 2000e(k). Under the PDA, employers are not required to give pregnant women special treatment; instead, employers must only treat pregnant women the same as all other prospective or current employees.

123.    The DMD Corporate Family possesses the Twin Peaks Job Description, which requires a Twin Peaks Girl to possess a high level of fitness upon hiring and throughout her employment. The DMD Corporate Family does not use an objective methodology to measure a person's fitness level (e.g., body mass index). Instead, the DMD Corporate Family relies on a subjective perception of a person's fitness level.

124.    Castaneda is aware of numerous Twin Peaks Girls, who are not affected by pregnancy, but are heavier or appear not to have the same level of fitness as she displayed during her August 20, 2018, re-hire interview. In fact, despite 20 days from losing her child, Castaneda appeared to be in a good level of fitness a few days before the August 20, 2018, interview.

125.    In contrast, the DMD Corporate Family continues to employ, and has subsequently hired, several women as Twin Peaks Girls who do not satisfy the Twin Peaks Job Description. Further, the DMD Corporate Family continues to employ, and has subsequently hired, other Twin Peaks Girls who were pregnant or possessed post-pregnancy weight.

126.    The DMD Corporate Family's subjective assessment that Castaneda's fitness level did not fulfill the Twin Peaks Job Description was: (a) solely attributable to her post-pregnancy weight; and (b) totally unrelated to her ability or inability to perform the job.

127.    The DMD Corporate Family's refusal to re-hire Castaneda was a result of intentional discrimination, which is demonstrated by at least five categories of direct and circumstantial evidence.

128.    First, DMD Corporate Family decision makers made statements that demonstrated bias toward Castaneda's pregnancy. Specifically:

a.    On August 14, 2018, Castaneda informed Boucher of her desire to return to work, as well as briefing him on her pregnancy, medical complications and losing her child. Boucher informed Castaneda: "I would love to have you, but you know what they're going to tell me about your weight." Castaneda informed Boucher the weight gain was due to complications from the pregnancy. Boucher suggested that Castaneda come back in one week to apply.

b.    Castaneda interviewed with Boucher on August 20, 2018.

c.    On August 21, 2018, Castaneda called Boucher, who informed her: "You are not going to like it. … Yeah, unfortunately, they said the weight is the issue and that you would need to lose weight to come back. …You know

it's not me and I would love to have you. It's them with the decision."

Boucher's "them" was a reference to Hester and Korokous. Hester and

Korokous made the final hiring decisions for DMD.

129.     Second, the close timing between the DMD Corporate Family's decision not to re-
hire Castaneda and the employer's knowledge of her pregnancy and related medical condition
suggests discrimination. In particular, Castaneda informed Boucher regarding her pregnancy,
medical complications and losing her child on August 14, 2018. Seven days later (or on August
21, 2018), Boucher informed Castaneda of the DMD Corporate Family's decision not to re-hire
her.

130.     Third, the DMD Corporate Family provided more favorable treatment of
employees of either sex who were not affected by pregnancy, childbirth, or related medical
conditions, but are similar in their ability or inability to work. Specifically, Castaneda is aware of
numerous Twin Peaks Girls, who are not affected by pregnancy, but are heavier or appear not to
have the same level of fitness as she displayed on or about August 20, 2018. In fact, despite 20
days from losing her child, Castaneda appeared to be in a good level of fitness a few days before
the August 20, 2018, interview. In contrast, the DMD Corporate Family continues to employ,
and has subsequently hired, several women as Twin Peaks Girls who do not meet the level of
fitness as mandated by the DMD Corporate Family.

131.     Third, DMD Corporate Family's explanation for the challenged action is suspect.
Specifically:

a.     The DMD Corporate Family contends it does not use weight as a hiring

criterion, but uses a person's fitness level.

b. However, the DMD Corporate Family cannot offer an objective methodology as to how it measures a person's fitness level (e.g., body mass index).

c. Instead, the DMD Corporate Family relies on a subjective perception of a person's fitness level.

d. For example, Castaneda is aware of numerous Twin Peaks Girls, who are not affected by pregnancy, but are heavier or appear not to have the same level of fitness as she displayed on or about August 20, 2018.

e. In fact, despite 20 days from losing her child, Castaneda appeared to be in a good level of fitness a few days before the August 20, 2018, interview.

f. In contrast, the DMD Corporate Family continues to employ, and has subsequently hired, several women as Twin Peaks Girls who do not meet the level of fitness as described by the DMD Corporate Family.

132. Fourth, the DMD Corporate Family violated or misapplied its own policy when it decided not to re-hire Castaneda. Specifically:

a. The DMD Corporate Family contends it does not use weight as a hiring criterion, but uses a person's fitness level.

b. In fact, during the EEOC process, the DMD Corporate Family stated the Twin Peaks Job Description requires a Twin Peaks Girl to possess "a high level of fitness ... upon hiring and throughout her employment."

c. Further, the DMD Corporate Family acknowledged "proudly employ[ing] wom[en] of all shapes and sizes, and whether they are pregnant or returning to work following a leave of absence."

d.   Castaneda is aware of numerous Twin Peaks Girls, who are not affected by pregnancy, but are heavier or appear not to have the same level of fitness as she displayed on or about August 20, 2018.

e.   However, the DMD Corporate Family violated its guidelines when it failed to re-hire Castaneda despite appearing to be in a good level of fitness and when it had previously and subsequently hired women who do not meet the level of fitness as described by the DMD Corporate Family.

133.   Fifth, the DMD Corporate Family's decision not to re-hire, even if it is not facially discriminatory, significantly burdened Castaneda and cannot be supported by a sufficiently strong justification. In this case, DMD acknowledged to the EEOC that it "proudly employ[ing] wom[en] of all shapes and sizes, and whether they are pregnant or returning to work following a leave of absence" However, DMD violated its guidelines when it failed to re-hire Castaneda despite appearing to be in a good level of fitness, but (a few weeks later) permitted another Twin Peaks Girl[14] with post-pregnancy weight to return to work.

134.   As a direct, legal and proximate result of the DMD Corporate Family's discrimination, Castaneda sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

135.   The DMD Corporate Family's unlawful actions were intentional, willful, malicious and/or done with reckless disregard to Castaneda's right to be free from discrimination based on pregnancy.

---

[14] This employee was required to wear a black maternity shirt until she lost her post-pregnancy weight.

## COUNT VI
## CASTANEDA: ADA PREGNANCY-RELATED IMPAIRMENT
## DISCRIMINATION AND FAILURE TO ACCOMODATE
## (DMD CORPORATE FAMILY)

136.    Castaneda re-alleges each and every allegation contained in paragraphs 1-41, as if they were fully set forth herein.

137.    Castaneda asserts this claim, which is based on Title I of the ADA, against the DMD Corporate Family for the entities': (a) discrimination or perceived discrimination of Castaneda due to her post-pregnancy weight gain and related medical issues, which are pregnancy-related temporary complications or impairments ("pregnancy-related complications"); and (b) failure to accommodate Castaneda's pregnancy-related complications.

138.    The DMD Corporate Family possesses the Twin Peaks Job Description, which requires a Twin Peaks Girl to possess a high level of fitness upon hiring and throughout her employment. The DMD Corporate Family does not use an objective methodology to measure a person's fitness level (e.g., body mass index). Instead, the DMD Corporate Family relies on a subjective perception of a person's fitness level.

139.    Castaneda is aware of numerous Twin Peaks Girls, who are not affected by pregnancy-related complications, but are heavier or appear not to have the same level of fitness as she displayed during her August 20, 2018, re-hire interview. In fact, despite 20 days from losing her child, Castaneda appeared to be in a good level of fitness a few days before the August 20, 2018, interview.

140.    In contrast, the DMD Corporate Family continues to employ, and has subsequently hired, several women as Twin Peaks Girls who do not satisfy the Twin Peaks Job Description. Further, the DMD Corporate Family continues to employ, and has subsequently hired, other Twin Peaks Girls who were pregnant or possessed post-pregnancy weight.

141.     The DMD Corporate Family's subjective assessment that Castaneda's fitness level did not fulfill the Twin Peaks Job Description was: (a) solely attributable to her pregnancy-related complications; and (b) totally unrelated to her ability or inability to perform the job.

142.     The DMD Corporate Family's refusal to re-hire Castaneda and accommodate her pregnancy-related complications was a result of intentional discrimination, which is demonstrated by at least five categories of direct and circumstantial evidence.

143.     First, DMD Corporate Family decision makers made statements that demonstrated bias toward Castaneda's pregnancy-related complications. Specifically:

a.     On August 14, 2018, Castaneda informed Boucher of her desire to return to work, as well as briefing him on her pregnancy, medical complications and losing her child. Boucher informed Castaneda: "I would love to have you, but you know what they're going to tell me about your weight." Castaneda informed Boucher the weight gain was due to complications from the pregnancy. Boucher suggested that Castaneda come back in one week to apply.

b.     Castaneda interviewed with Boucher on August 20, 2018.

c.     On August 21, 2018, Castaneda called Boucher, who informed her: "You are not going to like it. … Yeah, unfortunately, they said the weight is the issue and that you would need to lose weight to come back. …You know it's not me and I would love to have you. It's them with the decision." Boucher's "them" was a reference to Hester and Korokous. Hester and Korokous made the final hiring decisions for DMD.

144.    Second, the close timing between the DMD Corporate Family's decision not to re-hire Castaneda and its knowledge of her pregnancy-related complications suggests discrimination. In particular, Castaneda informed Boucher regarding her pregnancy-related complications on August 14, 2018. Seven days later (or on August 21, 2018), Boucher informed Castaneda of the DMD Corporate Family's decision not to re-hire her.

145.    Third, the DMD Corporate Family provided more favorable treatment of employees of either sex who were not affected by pregnancy-related complications, but are similar in their ability or inability to work. Specifically, Castaneda is aware of numerous Twin Peaks Girls, who are not affected by pregnancy-related complications, but are heavier or appear not to have the same level of fitness as she displayed on or about August 20, 2018. In fact, despite 20 days from losing her child, Castaneda appeared to be in a good level of fitness a few days before the August 20, 2018, interview. In contrast, the DMD Corporate Family continues to employ, and has subsequently hired, several women as Twin Peaks Girls who do not meet the level of fitness as mandated by the DMD Corporate Family.

146.    Third, DMD Corporate Family's explanation for the challenged action is suspect. Specifically:

   a.    The DMD Corporate Family contends it does not use weight as a hiring criterion, but uses a person's fitness level.

   b.    However, the DMD Corporate Family cannot offer an objective methodology as to how it measures a person's fitness level (e.g., body mass index).

   c.    Instead, the DMD Corporate Family relies on a subjective perception of a person's fitness level.

d.   For example, Castaneda is aware of numerous Twin Peaks Girls, who are not affected by pregnancy-related complications, but are heavier or appear not to have the same level of fitness as she displayed on or about August 20, 2018.

e.   In fact, despite 20 days from losing her child, Castaneda appeared to be in a good level of fitness a few days before the August 20, 2018, interview.

f.   In contrast, the DMD Corporate Family continues to employ, and has subsequently hired, several women as Twin Peaks Girls who do not meet the level of fitness as described by the DMD Corporate Family.

147.   Fourth, the DMD Corporate Family violated or misapplied its own policy when it decided not to re-hire Castaneda. Specifically:

a.   The DMD Corporate Family contends it does not use weight as a hiring criterion, but uses a person's fitness level.

b.   In fact, during the EEOC process, the DMD Corporate Family stated the Twin Peaks Job Description requires a Twin Peaks Girl to possess "a high level of fitness ... upon hiring and throughout her employment."

c.   Further, the DMD Corporate Family acknowledged "proudly employ[ing] wom[en] of all shapes and sizes, and whether they are pregnant or returning to work following a leave of absence."

d.   Castaneda is aware of numerous Twin Peaks Girls, who are not affected by pregnancy-related complications, but are heavier or appear not to have the same level of fitness as she displayed on or about August 20, 2018.

> e. However, the DMD Corporate Family violated its guidelines when it failed to re-hire Castaneda despite appearing to be in a good level of fitness and when it had previously and subsequently hired women who do not meet the level of fitness as described by the DMD Corporate Family.

148. Fifth, the DMD Corporate Family could have reasonably accommodated Castaneda's pregnancy-related complications, but refused to do so while also accommodating current employees and applicants. Further, none of the accommodations requested by Castaneda and/or required by her presented an undue burden or fundamentally altered the DMD Corporate Family's operations. In fact, DMD acknowledged to the EEOC that it "proudly employ[ing] wom[en] of all shapes and sizes, and whether they are pregnant or returning to work following a leave of absence" DMD also violated its guidelines when it failed to re-hire Castaneda despite appearing to be in a good level of fitness, but (a few weeks later) permitted another Twin Peaks Girl[15] with post-pregnancy weight to return to work.

149. As a direct, legal and proximate result of the DMD Corporate Family's discrimination, Castaneda sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

150. The DMD Corporate Family's unlawful actions were intentional, willful, malicious and/or done with reckless disregard to Castaneda's right to be free from discrimination based on her pregnancy-related complications.

---

[15] This employee was required to wear a black maternity shirt until she lost her post-pregnancy weight.

## COUNT VII
## CASTANEDA: FCRA PREGNANCY-RELATED IMPAIRMENT
## DISCRIMINATION AND FAILURE TO ACCOMODATE
## (DMD CORPORATE FAMILY)

151.    Castaneda re-alleges each and every allegation contained in paragraphs 1-41, as if they were fully set forth herein.

152.    Castaneda asserts this claim, which is based on the FCRA, against the DMD Corporate Family's discriminatory refusal to re-hire her as a Twin Peaks Girl. Specifically, the DMD Corporate Family refused to re-hire Castaneda because company officials believed her post-pregnancy weight prevented her meeting a subjective fitness level and from performing as a Twin Peaks Girl. Further, the DMD Corporate Family did not treat Castaneda the same as all other employees who did not meet the company's desired subjective fitness level.

153.    The DMD Corporate Family possesses the Twin Peaks Job Description, which requires a Twin Peaks Girl to possess a high level of fitness upon hiring and throughout her employment. The DMD Corporate Family does not use an objective methodology to measure a person's fitness level (e.g., body mass index). Instead, the DMD Corporate Family relies on a subjective perception of a person's fitness level.

154.    Castaneda is aware of numerous Twin Peaks Girls, who are not affected by pregnancy, but are heavier or appear not to have the same level of fitness as she displayed during her August 20, 2018, re-hire interview. In fact, despite 20 days from losing her child, Castaneda appeared to be in a good level of fitness a few days before the August 20, 2018, interview.

155.    In contrast, the DMD Corporate Family continues to employ, and has subsequently hired, several women as Twin Peaks Girls who do not satisfy the Twin Peaks Job Description. Further, the DMD Corporate Family continues to employ, and has subsequently hired, other Twin Peaks Girls who were pregnant or possessed post-pregnancy weight.

156.    The DMD Corporate Family's subjective assessment that Castaneda's fitness level did not fulfill the Twin Peaks Job Description was: (a) solely attributable to her post-pregnancy weight; and (b) totally unrelated to her ability or inability to perform the job.

157.    The DMD Corporate Family's refusal to re-hire Castaneda was a result of intentional discrimination, which is demonstrated by at least five categories of direct and circumstantial evidence.

158.    First, DMD Corporate Family decision makers made statements that demonstrated bias toward Castaneda's pregnancy. Specifically:

   a.    On August 14, 2018, Castaneda informed Boucher of her desire to return to work, as well as briefing him on her pregnancy, medical complications and losing her child. Boucher informed Castaneda: "I would love to have you, but you know what they're going to tell me about your weight." Castaneda informed Boucher the weight gain was due to complications from the pregnancy. Boucher suggested that Castaneda come back in one week to apply.

   b.    Castaneda interviewed with Boucher on August 20, 2018.

   c.    On August 21, 2018, Castaneda called Boucher, who informed her: "You are not going to like it. … Yeah, unfortunately, they said the weight is the issue and that you would need to lose weight to come back. …You know it's not me and I would love to have you. It's them with the decision." Boucher's "them" was a reference to Hester and Korokous. Hester and Korokous made the final hiring decisions for DMD.

48

159.    Second, the close timing between the DMD Corporate Family's decision not to re-hire Castaneda and the employer's knowledge of her pregnancy and related medical condition suggests discrimination. In particular, Castaneda informed Boucher regarding her pregnancy, medical complications and losing her child on August 14, 2018. Seven days later (or on August 21, 2018), Boucher informed Castaneda of the DMD Corporate Family's decision not to re-hire her.

160.    Third, the DMD Corporate Family provided more favorable treatment of employees of either sex who were not affected by pregnancy, childbirth, or related medical conditions, but are similar in their ability or inability to work. Specifically, Castaneda is aware of numerous Twin Peaks Girls, who are not affected by pregnancy, but are heavier or appear not to have the same level of fitness as she displayed on or about August 20, 2018. In fact, despite 20 days from losing her child, Castaneda appeared to be in a good level of fitness a few days before the August 20, 2018, interview. In contrast, the DMD Corporate Family continues to employ, and has subsequently hired, several women as Twin Peaks Girls who do not meet the level of fitness as mandated by the DMD Corporate Family.

161.    Third, DMD Corporate Family's explanation for the challenged action is suspect. Specifically:

      a.    The DMD Corporate Family contends it does not use weight as a hiring criterion, but uses a person's fitness level.

      b.    However, the DMD Corporate Family cannot offer an objective methodology as to how it measures a person's fitness level (e.g., body mass index).

49

    c.    Instead, the DMD Corporate Family relies on a subjective perception of a person's fitness level.

    d.    For example, Castaneda is aware of numerous Twin Peaks Girls, who are not affected by pregnancy, but are heavier or appear not to have the same level of fitness as she displayed on or about August 20, 2018.

    e.    In fact, despite 20 days from losing her child, Castaneda appeared to be in a good level of fitness a few days before the August 20, 2018, interview.

    f.    In contrast, the DMD Corporate Family continues to employ, and has subsequently hired, several women as Twin Peaks Girls who do not meet the level of fitness as described by the DMD Corporate Family.

162.    Fourth, the DMD Corporate Family violated or misapplied its own policy when it decided not to re-hire Castaneda. Specifically:

    a.    The DMD Corporate Family contends it does not use weight as a hiring criterion, but uses a person's fitness level.

    b.    In fact, during the EEOC process, the DMD Corporate Family stated the Twin Peaks Job Description requires a Twin Peaks Girl to possess "a high level of fitness ... upon hiring and throughout her employment."

    c.    Further, the DMD Corporate Family acknowledged "proudly employ[ing] wom[en] of all shapes and sizes, and whether they are pregnant or returning to work following a leave of absence."

    d.    Castaneda is aware of numerous Twin Peaks Girls, who are not affected by pregnancy, but are heavier or appear not to have the same level of fitness as she displayed on or about August 20, 2018.

e.     However, the DMD Corporate Family violated its guidelines when it failed to re-hire Castaneda despite appearing to be in a good level of fitness and when it had previously and subsequently hired women who do not meet the level of fitness as described by the DMD Corporate Family.

163.    Fifth, the DMD Corporate Family's decision not to re-hire, even if it is not facially discriminatory, significantly burdened Castaneda and cannot be supported by a sufficiently strong justification. In this case, DMD acknowledged to the EEOC that it "proudly employ[ing] wom[en] of all shapes and sizes, and whether they are pregnant or returning to work following a leave of absence" However, DMD violated its guidelines when it failed to re-hire Castaneda despite appearing to be in a good level of fitness, but (a few weeks later) permitted another Twin Peaks Girl[16] with post-pregnancy weight to return to work.

164.    As a direct, legal and proximate result of the DMD Corporate Family's discrimination, Castaneda sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

165.    The DMD Corporate Family's unlawful actions were intentional, willful, malicious and/or done with reckless disregard to Castaneda's right to be free from discrimination based on pregnancy.

**COUNT VIII**
**WIMBLE, PEREZ AND CASTANEDA:**
**FLSA UNDERPAYMENT OF WAGES (PRE-SHIFT ACTIVITIES)**
**(DMD CORPORATE FAMILY)**

166.    Wimble, Perez and Castaneda re-allege each and every allegation contained in paragraphs 1-68, as if they were fully set forth herein.

---

[16] This employee was required to wear a black maternity shirt until she lost her post-pregnancy weight.

167.     This claim is asserted by Wimble, Perez and Castaneda against the DMD Corporate Family for violations of the FLSA relating to the proper compensation for non-exempt employees' pre-shift activities.

168.     At all times material herein, Wimble, Perez and Castaneda were non-exempt employees and entitled to the rights, protections and benefits provided under the FLSA.

169.     During the times where Wimble, Perez and Castaneda worked non-tipped hours, Wimble, Perez and Castaneda were entitled to compensation at a rate equal to or greater than the Florida minimum wage. Specifically, the FLSA provides that an employee shall receive a federally-imposed minimum wage. See 29 U.S.C. § 206. However, federal regulations note that "[w]here a higher minimum wage than that set in the [FLSA] is applicable to an employee by virtue of ... other legislation, the regular rate of the employee ... cannot be lower than such applicable minimum, for the words 'regular rate at which he is employed'... must be construed to mean the regular rate at which he is lawfully employed." 29 C.F.R. § 778.5.

170.     As a result, the DMD Corporate Family was required to compensate Wimble, Perez and Castaneda for non-tipped work at the following rates:

Florida Minimum Wage:
2016-18 Calendar Years

| YEAR | MINIMUM WAGE |
|------|------|
| 2016 | $8.10 |
| 2017 | $8.10 |
| 2018 | $8.25 |

171.     Wimble, Perez and Castaneda were required to report to the restaurant no later than 30 minutes prior to a shift ("pre-shift period").

172.     Wimble, Perez and Castaneda were required to clock-in as "servers," which triggered the payroll system to base the pay rate at the tipped minimum wage rate (which was

$3.02 less than the Florida regular minimum wage), when they reported to the restaurant for the pre-shift period.

173. During approximately ten minutes of the pre-shift period, a manager would conduct a "pep rally" meeting, which involved a discussion of menu items, promotional activities or other relevant information with Wimble, Perez and Castaneda.

174. However, Wimble, Perez and Castaneda should have been paid the Florida regular minimum wage because the women were not serving customers or performing tip-related activities during the pre-shift period.

175. Based on the number of days Wimble, Perez and Castaneda worked each week (approximately four days), the DMD Corporate Family underpaid them the following amounts:

Approximate Underpayment Amounts for Pre-Shift Periods

| EMPLOYEE | 2016 | 2017 | 2018 | TOTAL |
|---|---|---|---|---|
| Wimble | $18.12 | $314.08 | $265.76 | $597.96 |
| Perez | $0 | $120.80 | $271.80 | $392.60 |
| Castaneda | $18.12 | $314.08 | $48.32 | $380.52 |
| TOTAL | | | | $1,371.08 |

176. The DMD Corporate Family's failure to properly compensate Wimble, Perez and Castaneda was willful.

177. As a result of the willful violations of the FLSA described in this Complaint, at least $1,371.08 (specifically, approximately $597.96 to Wimble, $392.60 to Perez and $380.52 to Castaneda) in unpaid compensation was withheld from Wimble, Perez and Castaneda and for which the DMD Corporate Family is liable under the FLSA.

## COUNT IX
### WIMBLE, PEREZ AND CASTANEDA:
### FLSA—MANDATORY UNIFORM AND COSTUME COSTS
### (DMD CORPORATE FAMILY)

178.    Wimble, Perez and Castaneda re-allege each and every allegation contained in paragraphs 1-68, as if they were fully set forth herein.

179.    This claim is asserted by Wimble, Perez and Castaneda against the DMD Corporate Family for minimum wage violations of the FLSA.

180.    At all times material herein, Wimble, Perez and Castaneda were entitled to the rights, protections and benefits provided under the FLSA.

181.    Wimble, Perez and Castaneda were non-exempt employees under the FLSA. The DMD Corporate Family paid Wimble, Perez and Castaneda the tipped minimum wage, as set forth by the Florida state government, and took a state-permitted $3.02 tip credit.

182.    The DMD Corporate Family subjected Wimble, Perez and Castaneda to the same personnel policies, including the Twin Peaks uniform and image standards and protocols. Further, the DMD Corporate Family required Wimble, Perez and Castaneda to purchase, clean and maintain their Twin Peaks uniforms and costumes at their own expense in violation of the FLSA. Specifically:

        a.      Wimble, Perez and Castaneda were required to wear the regular Twin Peaks uniform, which consists of khaki shorts, fur-lined boots, a cropped, tied-at-the-ribs midriff-baring shirt with a deep plunging neckline, Twin Peaks-branded socks and accessories. The DMD Corporate Family provided the uniform shirt and a pair of the Twin Peaks-branded socks, but Wimble, Perez and Castaneda were required to purchase khaki shorts, fur-lined boots and accessories (i.e., necklaces, "bling" sets).

54

b.      Further, the DMD Corporate Family sponsored, and currently sponsors, periodic mandatory special events called "costume parties" or "theme weeks." During these special events, Wimble, Perez and Castaneda were required to purchase and wear costumes that fit the Twin Peaks uniform and image standards and protocols for that particular holiday or occasions. For example, during "Sweetheart Week" (which occurred during the week of Valentine's Day), Wimble, Perez and Castaneda were required to wear red-themed, lingerie-inspired costumes.

183.    Wimble, Perez and Castaneda purchased, cleaned and maintained the following uniform items and costumes:

<u>Lacey Wimble</u>

| WORK EVENT | CLOTHING ITEMS (NUMBER OF ITEMS) | SOURCE AND APPROXIMATE COST (PER PIECE) AND PURCHASE DATE | APPROXIMATE TOTAL COST |
|---|---|---|---|
| Regular workdays | Khaki Shorts (2) | H&M ($20; January 2018) | $40 |
|  | Winter boots (2) | Zulily ($35; late 2016 and 2017) | $70 |
|  | Winter boots (1) | Peter Glenn ($120; early 2018) | $120 |
| Snow Bunnies Week[17][18] [January] | White tights (1) | Party City ($8; January 2017) | $8 |
|  | White shirt (1) | Party City ($10; January 2017) | $10 |
|  | Pink shorts (1) | Walmart ($10; January 2017) | $10 |
|  | Scarf (1) | Walmart ($15; January 2017) | $15 |
|  | White bralette (1) | Walmart ($10; January 2017) | $10 |
|  | White bralette (1) | Discovery | $10 |

---

[17] Snow Bunnies Costume Party.
[18] Twin Peaks Girls are required to wear white knee-high boots during this week. However, in 2017, Wimble refused to purchase the footwear due to the cost. Store manages deducted points from her overall grade as punishment.

| Work Event | Clothing Items (Number of Items) | Source and Approximate Cost (Per Piece) and Purchase Date | Approximate Total Cost |
|---|---|---|---|
| | | ($10; January 2018) | |
| | White jean shorts (1) | Discovery ($20; January 2018) | $20 |
| Sweetheart Week[19] [Valentine's Day] | Fishnets (1) | Hustlers ($14; February 2017) | $14 |
| | Baby doll lingerie (1) | Walmart ($10; February 2017) | $10 |
| | Undershorts (1) | Walmart ($10; February 2017) | $10 |
| St. Patrick's Day[20] [March] | Vest, choker and cuffs (1) | Party City ($14; March 2017) | $14 |
| NFL Sundays [Fall] | Miami Dolphins t-shirts (1) | Old Navy ($20; September 2017) | $20 |
| Halloween[21] [October] | Employee did not work event | | $0 |
| Black Friday[22] [Thanksgiving] | Black lingerie (1) | Lingerie store ($30; November 2017) | $30 |
| Accessories | Bling necklaces (2) | Discovery ($10; 2016 and 2017) | $20 |
| | Bling necklaces (3) | Walmart ($5; 2017 and 2018) | $15 |
| | Red heart plastic necklace (1) | Walmart ($5; February 2017) | $5 |
| | Shamrock plastic necklace (1) | Party City ($3; March 2017) | $3 |
| | Socks[23] (2) | Zulily ($10; 2016 and 2017) | $20 |
| | Socks (1) | Hot Topic ($8; 2017) | $8 |
| | Socks (2) | Walmart ($6; 2018) | $12 |
| | Fur knee high socks (1) | iParty ($30; January 2017) | $30 |
| | Bling sets (1) | Walmart ($15; 2017) | $15 |
| **Total Approximate Wage Underpayment** | | | $539 |

---

[19] Sweetheart Costume Party.

[20] St. Paddy's Costume Party.

[21] Halloween Costume Party.

[22] Black Friday Costume Party.

[23] DMD provided Twin Peaks Girls with one pair of red knee-high Twin Peaks-branded socks in 2016.

Katelyn Perez

| WORK EVENT | CLOTHING ITEMS (NUMBER OF ITEMS) | SOURCE AND APPROXIMATE COST (PER PIECE) AND PURCHASE DATE | APPROXIMATE TOTAL COST |
|---|---|---|---|
| Regular workdays | Khaki Shorts (2) | H&M ($20; August 2017) | $40 |
| | Khaki Shorts (1) | Walmart ($13; 2017 or 2018) | $13 |
| | Khaki Shorts (3) | Acromia & Fitch ($16; 2017 and 2018) | $48 |
| | Winter boots (1) | Sawgrass Mall store ($130; August 2017) | $130 |
| | Twin Peak-branded shirt[24] (1) | Twin Peaks ($20; 2017) | $20 |
| Snow Bunnies Week [January] | White Bandeau shirt and socks (1) | Discovery ($30; January 2018) | $30 |
| | White shorts (1) | Party City ($12; January 2018) | $12 |
| Sweetheart Week [Valentine's Day] | Lingerie (1) | Victoria Secret ($90; February 2018) | $90 |
| | Black stockings (1) | Walmart ($5; February 2018) | $5 |
| St. Patrick's Day [March] | Employee did not work event | | $0 |
| Lumber Jill Week [Labor Day] | Jean shorts (1) | Hollister ($14; August 2017) | $14 |
| College football Saturdays [Fall] | University of Miami (1) and Florida International University (2) t-shirts | Walmart and thrift shop ($15; August or September 2017) | $45 |
| NFL Sundays [Fall] | Miami Dolphins (2) and Philadelphia Eagles (1) t-shirts | Walmart and thrift shop ($15; August or September 2017) | $45 |
| Halloween [October] | Employee did not work event | | $0 |
| Black Friday [Thanksgiving] | Employee did not work event | | $0 |
| Accessories | Necklace (1) | Claire's ($15, August 2017) | $15 |
| | Bling belt (1) | Store in Davie, Florida ($80; August 2017) | $80 |
| | Bling choker (1) | Marshalls | $5 |

---

[24] This uniform item replaced Perez's original uniform top, which was unintentionally damaged during a work shift.

| WORK EVENT | CLOTHING ITEMS (NUMBER OF ITEMS) | SOURCE AND APPROXIMATE COST (PER PIECE) AND PURCHASE DATE | APPROXIMATE TOTAL COST |
|---|---|---|---|
| | | ($5; August 2017) | |
| | Knee-high socks (1) | Target or Walmart ($5; 2017) | $5 |
| | Knee-high stockings (1) | Target or Walmart ($6; 2017) | $6 |
| TOTAL APPROXIMATE WAGE UNDERPAYMENT | | | $603 |

Jennifer Castaneda

| WORK EVENT | CLOTHING ITEMS (NUMBER OF ITEMS) | SOURCE AND APPROXIMATE COST (PER PIECE) AND PURCHASE DATE | APPROXIMATE TOTAL COST |
|---|---|---|---|
| Regular workdays | Khaki shorts (1) | Hollister ($15; 2017) | $15 |
| | UGG Boots (1) | Amazon ($50; January 2017) | $50 |
| Snow Bunnies Week [January] | Crop top t-shirt (1) | Amazon ($14; January 2017) | $14 |
| Black Friday [Thanksgiving] | Employee did not work event | | $0 |
| Accessories | Necklaces (4) | Discovery ($10; approximately every four months after January 2017) | $40 |
| TOTAL APPROXIMATE WAGE UNDERPAYMENT | | | $119 |

184.     The DMD Corporate Family failed to compensate or reimburse Wimble, Perez and Castaneda for the cost of the purchase, cleaning and maintenance of their uniforms and costumes.

185.     Due to the unreimbursed costs associated with the purchase, cleaning and maintenance of the uniform and costumes, the wages of Wimble, Perez and Castaneda fell below the Florida minimum wage for the week in which the costs were incurred.

186.     The DMD Corporate Family's failure to reimburse Wimble, Perez and Castaneda for the costs of purchasing, cleaning and maintaining uniforms and costumes was willful.

187.    As a result of the willful violations of the FLSA described in this Complaint, at least $1,261 (specifically, approximately $539 to Wimble, $603 to Perez and $119 to Castaneda) in compensation from Wimble, Perez and Castaneda has been unlawfully withheld or costs not reimbursed by the DMD Corporate Family for which its liable under the FLSA.

## COUNT X
## WIMBLE: INVASION OF PRIVACY
## (DMD)

188.    Wimble re-alleges each and every allegation contained in paragraphs 1-28 and 42-55, as if they were fully set forth herein.

189.    Wimble asserts this claim, which is based on the Florida common law tort of invasion of privacy, against DMD.

190.    At Twin Peaks Davie, DMD operated a "glam room," which was, and is, used by Twin Peaks Girls to store personal belongings (in lockers), take breaks, adjust uniforms, apply make-up and prepare for shifts.

191.    Wimble and other Twin Peaks Girls often used the glam room to change from their personal/street clothes into Twin Peaks uniforms and costumes. Specifically, Wimble changed from her personal top into her Twin Peak uniform top, and thereby exposing her body, in the glam room approximately five times during her employment. Wimble recalled approximately six to seven Twin Peaks Girls also changed clothes in the glam room. During those occasions, Wimble recalled the Twin Peaks Girls often would expose sexual organs during their change of clothes.

192.    DMD placed an imaging device (i.e., security camera) by an exit sign near the glam room. The imaging device was directed to the glam room.

193.    Wimble and other Twin Peaks Girls were informed the imaging device was inoperative. In fact, when Twin Peaks Girls reported personal items were stolen in the glam room, DMD managers informed the employees that the imaging device did not work.

194.    Even if DMD possessed a legitimate business interest in conducting surveillance of the glam room, DMD did not post a prominent and clearly visible sign containing a warning about camera surveillance in or near the glam room or orally provided notice to Wimble that the imaging device was operative.

195.    Based on DMD's representations, Wimble possessed an expectation of privacy when she dressed, undressed or privately exposed her body in the glam room. Further, Wimble did not consent to the use of the imaging device to surveil the glam room.

196.    DMD intentionally intruded upon and invaded Wimble's solitude, seclusion and privacy when it used or installed an imaging device to secretly view, broadcast or record Wimble, without her knowledge and consent, who was dressing, undressing or privately exposing her body, at a place and time when she had a reasonable expectation of privacy. Thus, DMD's intrusion would be highly offensive to a reasonable person and was unwarranted and unjustified. Further, DMD's conduct was intentional, reckless or negligent.

197.    As a result of DMD's violation of her right to privacy, Wimble suffered injury and irreparable harm as a proximate cause of such the intrusion.

## COUNT XI
## WIMBLE, PEREZ AND CASTANEDA:
## TITLE VII AND FCRA THIRD-PARTY RETALIATION
## (DMD CORPORATE FAMILY)

198.     Wimble, Perez and Castaneda re-allege each and every allegation contained in paragraphs 1-68, as if they were fully set forth herein.

199.     Wimble, Perez and Castaneda assert this claim, which is based on the United States Supreme Court's interpretation of third-party retaliation under Title VII in Thompson v. N. Am. Stainless, LP, 562 U.S. 170 (2011), against the DMD Corporate Family when it took adverse action against Michael L. Buckner ("Buckner"), who is the legal counsel for Wimble and Castaneda, in retaliation for filing Charges of Discrimination with the EEOC.

200.     Buckner was a regular customer at Twin Peaks Davie from 2017 to October 1, 2018. Specifically, Buckner visited Twin Peaks Davie at the end of the workday or on the weekends to relax, grab a bite to eat (or drink beverages), watch sporting events and socialize with Twin Peaks Girls, managers and regular customers.

201.     During this period, Buckner developed professional and personal relationships with numerous Twin Peaks Girls, other employees and regular customers. Buckner also socialized with Twin Peaks Girls, other employees and regular customers at restaurants, bars and other locations.

202.     Employees (including Twin Peaks Girls) and regular customers knew Buckner was a lawyer and was aware of his sports law and litigation practice.

203.     In fact, approximately once a week, an employee or customer approached Buckner with legal questions or requests for consultations on issues affecting themselves, family members or friends. Some of the consultations turn into client-retained matters. For example,

from approximately October 2017 to approximately October 2018, Buckner represented employees (or, in one case, an employee's domestic partner) in 13 cases.

204.    Further, on October 1, 2018, Buckner was in the initial consultation phase with current or former employees to open at least four additional matters—all of which were not formalized due to his subsequent banishment from Twin Peaks Davie.

205.    All 17 current and potential cases were from persons who either approached Buckner directly at Twin Peaks Davie or were referred to Buckner by employees. The cases were not solicited as that term is defined in Florida Bar rules.

206.    Buckner was retained by Wimble, Perez and Castaneda to represent them in administrative and legal matters concerning discriminatory conduct against the DMD Corporate Family. Buckner subsequently prepared and mailed Charges of Discrimination on behalf of Wimble, Perez and Castaneda.

207.    On or about September 20, 2018, the EEOC received the charges of discrimination of Wimble, Perez and Castaneda.

208.    On September 28, 2018, at approximately 10:40 am ET, in an effort to respond to a request for information from the EEOC, Buckner accompanied Perez to the DMD Corporate Family office to review her human resources/personnel file. Buckner and Perez were informed by Flechner and Burgess that Perez's personnel file was not at the office, but it was maintained at Twin Peaks Davie.

209.    Buckner and Perez immediately traveled to Twin Peaks Davie. At approximately 11:00 am ET, Perez requested her personnel file from Boucher, who subsequently provided Perez with her file. Perez reviewed the file and only found two pages in it. Her file did not contain the written complaint she made against Kridos.

210.    On October 1, 2018, at 8:46 am ET, the DMD Corporate Family received notice of the Charges of Discrimination filed by Buckner.

211.    Later at 5:06 pm ET on October 1, 2018 (which was approximately three days after Buckner and Perez appeared at the DMD Corporate Family office and approximately eight hours after receiving the Charges of Discrimination), the DMD Corporate Family's legal counsel informed Buckner (via email) of its decision to ban him from Twin Peaks Davie, Twin Peaks Fort Myers, Twin Peaks Pembroke Pines and Twin Peaks West Palm Beach.

212.    The DMD Corporate Family claimed Buckner was soliciting employees to file claims against the company. Further, the DMD Corporate Family claimed Buckner's alleged solicitation efforts were causing a disturbance at the restaurant.

213.    Buckner did not solicit Wimble, Perez and Castaneda and did not cause a disturbance at the restaurant concerning their Charges of Discrimination. The DMD Corporate Family's assertions were pre-textual.

214.    The DMD Corporate Family's decision to bar Buckner from its restaurants constituted an adverse action against Wimble and Castaneda since it: (a) was done in response to the protected activities of Buckner, Wimble and Castaneda; (b) will cause, and has caused, other Twin Peaks Girls to be less inclined to complain about discrimination or to retain a lawyer to understand their legal rights; and (c) has and will continue to adversely affect Buckner's legal practice.

215.    As a direct, legal and proximate result of the DMD Corporate Family's retaliatory behavior, Wimble, Perez and Castaneda sustained, and will continue to sustain, damages in an amount to be proven at trial.

216.    The DMD Corporate Family's unlawful actions were intentional, willful, malicious and/or done with reckless disregard to Wimble, Perez and Castaneda's right to be free from discrimination and retaliatory behavior.

**PRAYER FOR RELIEF**

217.    WHEREFORE, Wimble, Perez and Castaneda request this Court issue judgment against DMD, DMD Florida, DMD Restaurant Group and DMD Ventures as follows:

a.    Declaring DMD, DMD Florida, DMD Restaurant Group and DMD Ventures' actions, policies, practices and retaliatory decisions as alleged in this Complaint are unlawful;

b.    Reinstating or re-hiring Wimble, Perez and Castaneda as Twin Peaks Girls, pursuant to 29 U.S.C. § 216(b), 42 U.S.C. § 2000e-5(g); 42 U.S.C. § 12117; Fla. Stat. § 760.11(5); and any other applicable federal or state law;

c.    Awarding back and front pay; lost or unpaid wages; and other compensation, in an amount to be proven at trial, pursuant to 29 U.S.C. § 216(b), 42 U.S.C. § 2000e-5(g), 42 U.S.C. § 12117; Fla. Stat. § 760.11(5); and any other applicable federal or state law;

d.    Awarding compensatory and punitive damages, in an amount to be proven at trial; pursuant to 42 U.S.C. § 1981a(b); 42 U.S.C. § 12117; Fla. Stat. § 760.11(5), the Florida common law; and any other applicable federal or state law;

e.    Awarding liquidated damages, pursuant to 29 U.S.C. § 216(b); and any other applicable federal or state law;

f.   Awarding interest on lost wages, compensation and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

g.   Enjoining DMD, DMD Florida, DMD Restaurant Group and DMD Ventures from engaging in the unlawful acts complained in this Complaint;

h.   Awarding attorney's fees, costs and expenses to Wimble, Perez and Castaneda's legal counsel, pursuant to 29 U.S.C. § 216(b); 42 U.S.C. § 2000e-5(k); 42 U.S.C. § 12205; Fla. Stat. § 760.11(5); and any other applicable federal or state law; and

i.   Granting such other relief (in law or equity) to Wimble, Perez and Castaneda as this Court may deem just and proper.

## JURY DEMAND

218.   Wimble, Perez and Castaneda demand a trial by jury of all issues so triable pursuant to Federal Rule of Civil Procedure 38.

Dated: December 10, 2019.                Respectfully submitted,

s/ Michael L. Buckner
_____
Michael L. Buckner, Esquire
Florida Bar No. 106331
Email: michaelbucknerlaw@gmail.com
Michael L. Buckner Law Firm, P.A.
4977 NW 67th Avenue
Lauderhill, Florida 33319
Office: +1-954-572-0004
Facsimile: +1-954-578-1440

Attorney for Plaintiffs, Lacey Wimble, Katelyn Perez and Jennifer Castaneda